BENJAMIN H. McCRACKIN, JR. AND CLARA P. McCRACKIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McCrackin v. Commissioner
Docket No. 30049-81.
United States Tax Court
T.C. Memo 1984-293; 1984 Tax Ct. Memo LEXIS 384; 48 T.C.M. (CCH) 248; T.C.M. (RIA) 84293; June 4, 1984. Nicholas Bouler, for the petitioners. Frank Simmons, for the respondent. SHIELDS
MEMORANDUM FINDINGS *385 OF FACT AND OPINION SHIELDS, Judge: Respondent determined that there are deficiencies in income tax due from petitioners as follows: Year
Deficiency
1975
$7,067.87
1976
3,528.50
1978
4,165.00
The issues are (1) whether certain losses sustained by petitioners constituted business or nonbusiness bad debts; and (2) whether a certain legal fee paid by the petitioners is deductible as a business expense. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Benjamin H. McCrackin, Jr. and Clara P. McCrackin, husband and wife, resided in Birmingham, Alabama, when they filed their petition in this case. Their income tax returns were prepared on the cash basis of accounting. Their joint returns for the years in issue were filed with the Internal Revenue Service Center, Chamblee, Georgia. Prior to 1954, Mr. McCrackin was employed by Franklin Coal Company, a proprietorship owned by R. T. Daniel. Mr. Daniel died in 1954, and the company was acquired by his son-in-law and Mr. McCrackin. The son-in-law died in 1957 and thereafter the *386 company was owned by Mr. McCrackin. The principal business activity of Franklin Coal Company prior to 1954 was brokering coal but it also mined and transported coal, brokered timber, loaned money, and operated a commissary. During or shortly before 1954 the demand for coal declined, the mining of coal became less profitable, and as a result, the company ceased mining, changed its name to Franklin Coal Sales Company, and began to concentrate on its brokerage activities. After his acquisition of the company in 1957, Mr. McCrackin continued its operation in the same name and along the same general lines. For instance, he continued to broker coal and to make loans. The company also owned and managed a building, housing several flea markets; a Kenworth truck, with trailer; an airplane, for crop dusting; and two small businesses known as Franklin Realty Company and Franklin Supply Company. For 1975, 1976 and 1978, Franklin Coal Sales had gross incomes of $18,275.60, $17,465.15 and $1,495.98, respectively. For 1975 and 1976 it had net incomes of $16,080.45 and $14,831.01. For 1978 it had a net loss after deducting the disputed bad debts and legal fees of $73,930.79. During *387 the years 1960 through 1975 Franklin Coal Sales made 66 loans to 12 different borrowers none of whom were related in any way to petitioners. Fifty-two of the loans totaling $432,856.00 were made from 1960 through 1969 to 9 different borrowers. Some of these loans were made in connection with the coal brokering activities. They usually occurred when McCrackin would arrange a sale of coal for a small mine owner and would advance a discounted sales price to the seller of the coal and collect the full sales price from the purchaser of the coal. The advance was secured by the receivable and/or a bill of lading. Such discounts were not reported by the petitioners as interest income but on their Schedule C for Franklin Coal Sales as income from the brokerage business. During this period the petitioners also made 42 loans to Frank B. Tombrello Construction Company. These loans bore interest, were represented by promissory notes, and were secured by accounts receivable. In or about 1970 Franklin Coal Sales Company ceased its brokerage activities and Mr. McCrackin became a full-time consultant for Gulf State Paper Company. He subsequently worked for other firms until 1976, but in spite *388 of this full-time employment he continued to supervise the activities of Franklin Coal Sales. From 1970 through 1975 the company made 14 loans totaling $187,568.00 to four different borrowers, including Chelsea Timber Company, the recipient of the $77,100.00 in loans which resulted in the disputed losses discussed hereinafter. All 14 of these loans bore interest and were secured. The interest received on these 14 loans was also reported by the petitioners as business income on Schedule C of their returns. Throughout the period under consideration, petitioners kept the business activities of Franklin Coal Sales separate and apart from their personal assets and affairs. They maintained a separate bank account and a separate set of accounting records for Franklin Coal Sales. In fact, their records were such that even within the company the income from the loans was kept separate and apart from the income from other sources. They never engaged in any formal advertising of their loan activity, but in the business community in which Franklin Coal Sales operated it was generally known that it, as well as its predecessor, had funds available for loans. Petitioners were approached *389 on many occasions by prospective borrowers whose requests had to be declined after their credit was screened by Mr. McCrackin or because petitioners' funds were all committed elsewhere. During 1976 and 1977 and thereafter to the date of trial they were unable to make any new loans because their funds were invested in the Chelsea loans. On November 1, 1974, the petitioners, doing business as Franklin Coal Sales Company, entered into an oral agreement with John B. Bates, a lawyer and personal friend. Pursuant to the agreement the petitioners gave Bates $47,100.00 with the understanding that (1) the funds were to be held by Bates in a special trust account and were not to be co-mingled by him with any other funds; (2) the funds in the special account were to be disbursed for the petitioners by Bates to Chelsea Timber Company in exchange for negotiable instruments payable to petitioners and secured by bills of lading for carload shipments of timber; and (3) payment for each carload of timber covered by a bill of lading held by Bates was to be made directly to Bates for petitioners and such payment was to be deposited by Bates into the special account and applied to the negotiable *390 instrument secured by that particular bill of lading. During November and December of 1974, Bates advanced the entire $47,100.00 to Chelsea for the petitioners. On February 4, 1975 [1] the petitioners made a separate loan to Chelsea Timber Company of $30,000.00 at a 25 percent interest rate. This loan was also handled by Bates for the petitioners and was secured by a second mortgage on real estate owned by Chelsea which Bates assured the petitioners was worth over $400,000.00 and was subject only to a first mortgage of about $100,000.00. In late 1977, Mr. McCrackin became concerned about the loans made to Chelsea and told Bates not to advance any more funds from the special account. Upon further investigation, McCrackin discovered early in 1978 that many of the notes from Chelsea which were held by Bates were secured by forged bills of lading and that some of the bills of lading were pledged *391 to secure more than one note. To further complicate an already bad situation, James R. Nevins, the president and principal stockholder of Chelsea Timber Company, was killed in an airplane crash in February of 1978; in May of 1978 Chelsea Timber Company ceased all operations; and about the middle of 1978 the holder of the first mortgage on Chelsea's real estate foreclosed and petitioners received only $1,585.75 on their second mortgage. Prior to the foreclosure petitioners had attempted to purchase the first mortgage in order to protect their investment in the second mortgage but learned that the property was also subject to a tax lien which practically eliminated their security. In August of 1978 petitioners consulted with Matt Paul Scalici, an attorney, about what remedies, if any, they had against Chelsea Timber Company, the estate of James R. Nevins and/or John B. Bates. Mr. Scalici advised the petitioners that in his opinion "the only party left to respond to you, either in damages or by way of reimbursement, is Mr. Bates;" and that the petitioners should pay Mr. Scalici a retainer of $2,500.00 and authorize him to proceed against Bates. Pursuant to Mr. Scalici's advice *392 petitioners pad the retainer and Mr. Scalici filed a lawsuit against Bates on December 15, 1978 in the Circuit Court for Jefferson County, Alabama. On February 29, 1980, a consent judgment was entered against Bates for $47,100.00. In 1980 Bates also entered into a written agreement with the petitioners covering the manner in which the consent judgment would be paid and assigned certain notes and mortgages to secure its payment.By the time of trial, he had paid $5,500 on the judgment. On their 1978 return the petitioners claimed a loss in the amount of $70,399.87 with respect to the $47,100.00 and the $30,000.00 second mortgage. The petitioners now agree that due to a mathematical error the loss was incorrectly shown on the return and that the correct amount of the loss should have been $69,501.87 computed as follows: Loans to Chelsea via Bates
$47,100.00
Second Mortgage
30,000.00
Total
$77,100.00
Less Collections: On Loans to Chelsea via Bates
$6,012.38
On Second Mortgage
1,585.75
7,598.13
Loss
$69,501.87
The loss was claimed by the petitioners as a business bad debt on their Schedule C for Franklin Coal Sales Company. Respondent does *393 not dispute the amount of the loss but contends that it is a nonbusiness bad debt and not a business bad debt. On the Schedule C for Franklin Coal Sales Company the petitioners also deducted as a business expense the $2,500.00 retainer fee paid to Mr. Scalici to bring the lawsuit against Bates. Respondent concluded that the fee was not an ordinary and necessary business expense and disallowed the deduction. OPINION Bad Debts
The first issue is whether the losses that petitioners sustained as a result of the Chelsea transactions are deductible as business bad debts under section 166(a)(1) [2] or as nonbuiness bad debts under section 166(d)(2). [3] Petitioners contend that part of the business conducted by them in Franklin Coal Sales Company consisted of lending money and that the loans in issue were made in the regular course of that business. Respondent contends that petitioners' lending activities were not sufficient to constitute a trade or business. As pointed out by respondent, we have often considered the extent of a particular taxpayer's lending activity as being on too small a scale or with insufficient regularity to elevate such activity to the status of *394 a business. See ; ; . In such cases, we have also looked for other indications of a genuine loan business, i.e., whether the taxpayer kept appropriate records; whether his loan transactions were separate and apart from his other activities; and whether the taxpayer actively sought such business. We have also considered the amount of time and effort expended in pursuit of the lending activity and the relationship between the taxpayer and his debtors. See ; . See also , cert. denied . *395 In support of his contention that petitioners were not in the business of making loans respondent relies upon the small number of loans that petitioners made during the years in dispute; the failure of the petitioners to separate their lending business from the other business activities of Franklin Coal Sales; the failure of petitioners to advertise their lending activities; and, the fact that Mr. McCrackin was a full-time employee of another company. Despite respondent's contention to the contrary it is apparent from the record as a whole that from 1957 through the date of the trial, a period of approximately 25 years, Mr. McCrackin, with some help from his wife, owned and operated a sole proprietorship under the name of Franklin Coal Sales Company and that the activities of such proprietorship included among other things the making of loans. In fact, respondent stipulated that from 1960 through 1975, Franklin Coal Sales made 66 loans involving $620,424.00 to 12 different borrowers none of whom were related in any way to the petitioners. During part or all of the same period and in addition to making loans, Franklin Coal Sales also brokered coal and timber and owned and operated *396 the following: a building, which housed several flea markets; a Kenworth truck, with trailer; an airplane, for crop dusting; and two small businesses, known as Franklin Realty Company and Franklin Supply Company. The income of the proprietorship including the interest and discounts earned on the 66 loans and all of the expenses of the proprietorship were recorded by the petitioners in a separate set of accounting records and reported by them on business schedules attached to their income tax returns. Mr. McCrackin screened all loan applicants for credit purposes and Mrs. McCrackin did the bookkeeping and other detail work. For several years they maintained a separate office for the proprietorship but after the brokerage activities were discontinued they moved the operation to their home. At all times the proprietorship had a separate bank account in its own name and all notes and other documents appearing in the record were made in the name of B. H. McCrackin, Jr. and/or Clara McCrackin doing business as Franklin Coal Sales Company. This included the notes for loans to Chelsea through Bates. It is true that the petitioners never advertised the loan part of the proprietorship's *397 activities but from their credible and uncontroverted testimony we have found that in the business community in which they operated it had been generally known for over 20 years that Franklin Coal Sales, as well as its predecessor, had funds to lend. We have also found that over the years a number of applicants were turned down either because they failed to pass Mr. McCrackin's credit screen or because at the time of their application the company's funds were committed elsewhere. In this connection we have also found that no loans were made after 1975 because the petitioners were unable to recover the funds advanced to Chelsea. It is also true that during the years in dispute and for some time prior thereto Mr. McCrackin was employed full-time by other firms but the parties have stipulated that during this period he "continued to carry on the Franklin Coal Sales business." In fact the record clearly shows that from 1957 through the date of the trial the petitioners made every managerial decision with respect to Franklin Coal Sales including the decisions with respect to the loans made to Chelsea through Bates. Furthermore it is well settled that a taxpayer can be engaged in more *398 than one trade or business. ; . In view of all the foregoing we conclude that the activities of the petitioners which were conducted over the years in the name and style of Franklin Coal Sales constituted a business; that part of such business consisted of making loans; that the loans made to Chelsea by petitioners through Bates and the losses sustained as a result thereof were incurred in connection with such business; and that consequently, such losses constitute business bad debts under section 166. See ; , cert. denied ; . [4]
*399 Attorney Fee
Respondent has conceded that the retainer fee paid to Mr. Scalici is deductible in 1978 as a business expense if we find that the losses on the Chelsea loans are business bad debts. Since we have so found, this issue is rendered moot. Decision will be entered under Rule 155.
Footnotes
1. In the stipulation of facts this date is shown as February 4, 1974.↩ The parties, however, further stipulated that this transaction was subsequent to the agreement of November 1, 1974 and from this and the record as a whole it is apparent that February 4, 1975 is the correct date.
2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
3. The pertinent portions of sections 166(a)(1) and 166(d)(1) and (2) are as follows: SEC. 166. BAD DEBTS. (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) NONBUSINESS DEBTS.-- (1) GENERAL RULE.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
4. In his notice of deficiency respondent determined that it had not been established that the debts became worthless in 1978. As respondent did not address this issue in either his opening or reply briefs, we consider this matter to have been conceded. Accordingly, we do not address the implications of the pendency in 1978 of petitioners' suit against Bates.↩